# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DAVID CROCKETT | : | CIVIL ACTION |
|---|---|---|
| Plaintiff, | : | |
| v. | : | |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION ASSOCIATION, ET AL., | : | NO. 12-4230 |
| Defendants | : | |

## MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS COUNTS I, IV, V, VI, VII, AND VIII

**Baylson, J.**                                                                                                             **June 14, 2013**

## I. INTRODUCTION

This action arises out of an injury that Plaintiff, David Crockett, suffered while exiting a train owned and operated by the Defendant Southeastern Pennsylvania Transportation Association ("SEPTA"). In his Amended Complaint, Crockett alleges state law claims against SEPTA for both negligence and negligence per se. Crockett also alleges, pursuant to 42 U.S.C. § 1983, that SEPTA and the individual Defendants[1] violated his substantive due process right under the Fourteenth Amendment to be protected from state-created dangers. Defendants have moved to dismiss Crockett's federal claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 28). For the reasons discussed below, Defendants' motion will be GRANTED. The case will proceed in diversity jurisdiction on Crockett's state tort claims against SEPTA.

---

1 The individual Defendants are Pasquale T. Deon, Chairman of SEPTA's Board of Directors; SEPTA Managers Jack K. Leary, Faye Moore, Joseph Casey, Luther Diggs, Pat Nowakowski, Bernard Cohen, Jeffrey Knuppel, and James Jordan; and SEPTA's general counsel, Nicholas J. Staffieri.

## II. FACTS & PROCEDURAL HISTORY

Crockett's Amended Complaint alleges the following facts, which for the purposes of this motion, the Court must accept as true: SEPTA's regional rail system uses both low- and high-level platforms. The low-level platforms require the use of stairs to exit the train; the high-level platforms do not. Am. Compl. ¶ 22. To service both platform levels, SEPTA's rail cars have retractable stair systems that, when not in use, are hidden behind trap doors. Id. ¶ 23. These trap doors have a defect that, on occasion, propels them to unexpectedly and violently spring open, causing harm to those in the way. Id. ¶ 28. SEPTA has known about this problem since the 1980s. Id. ¶ 29. At that time, SEPTA began experimenting with cost-effective solutions to fix the problem. Id. The problem, however, was never fixed.

In 1993, in response to SEPTA's request for recommendations on how to improve its rail system, a report by the University of Pennsylvania and University of Delaware recommended that SEPTA's low-level platforms be converted to high-level platforms. Id. ¶¶ 24-25. The main reasons cited for making this conversion were "the great benefits in the speed of boarding/alighting, door control, lower labor requirements and increased safety." Id. ¶ 26. SEPTA has not yet made this conversion. Id. ¶ 30.

SEPTA's failure to remove the trap door hazard is what gives rise to Crockett's claim. On September 1, 2010, as Crockett prepared to exit a SEPTA train in Trenton, New Jersey, a "trap door violently sprang forward, striking Plaintiff on his right leg and slam[ing] down on his left foot, trapping the foot beneath the heavy metal door." Id. ¶¶ 58, 63. This incident caused Crockett serious injuries, including "numerous foot fractures"; "multiple mid-foot fractures"; lateral dislocation of his first, second, third, fourth, and fifth metatarsals; contusions; embarrassment; and disfigurement. Id. ¶ 75.

In the years prior to Crockett's injury, other passengers suffered similar harm, including foot fractures and—in some cases—toe amputations. Id. ¶ 31. In 2007, three years prior to Crockett's injury, there were at least nine reported instances of trap door-related injuries on SEPTA's railcars. Id. ¶ 32. According to Crockett, the particular railcar, Train Car 282 ("282"), on which he was injured is "extremely dangerous." Id. ¶¶ 20, 47. The trap doors on 282 sprung open at the wrong time on "at least a dozen occasions," and had been "repaired more than 50 times since 1988." Id. ¶¶ 48, 55. On one occasion, 282's trap doors caused an injury when an employee tripped over a trap door that had spontaneously sprung open. Id. ¶ 48. Despite this, SEPTA "took no action to fix" the defect. Id. ¶ 55.

Not only did SEPTA fail to fix the trap door problem on 282 and its other railcars, it allegedly "took actions to make its trains less safe." Id. ¶ 33 (emphasis omitted). Specifically, in order to cut costs, SEPTA decided in the mid-1990s "to forgo daily inspections of its rail cars, including Train Number 282." Id. Instead of daily inspections, "SEPTA decided to inspect its cars only every 92 days and to make repairs on an as-needed basis." Id. "By deciding to forgo daily inspections of rail cars and trap doors," Crockett alleges that "SEPTA and its managers implemented a policy that resulted in conscious disregard of known defects and the substantial risk of trap door injuries, all for financial gain." Id. ¶ 34.

In February 2008, SEPTA management concluded "there doesn't appear to be a significant problem" with its trap door system. Id. ¶ 35. Crockett alleges, however, that the real reason SEPTA managers did not correct the problem was because they "knew that SEPTA's negligence liability under Pennsylvania law is capped at $250,000." Id. ¶ 36. In support of this, Crockett cites an excerpt from an April 2000 Blue Ribbon Panel report that concluded SEPTA's

management places "too great a reliance on the protections of the $250,000 cap on personal injury recovery against SEPTA provided by Pennsylvania's Sovereign Immunity Act." Id. ¶ 37.

In response to the Blue Ribbon Panel's report, SEPTA promulgated a "Safety Awareness and Environmental Protection Policy" in 2005. Id. ¶ 40. The policy states that SEPTA management must "strive to probatively reduce identified hazards and risks to the lowest reasonable levels for passengers, employees, and the general public." Id. ¶ 42. SEPTA also enacted a policy requiring the placement of warning signs to alert passengers to known hazards. Id. ¶ 43. Despite these new policies, SEPTA management "failed to post a single warning about the trap doors," and "failed to correct the regional trap door system," thereby "causing a known and continued danger to riders such as Plaintiff and to the public." Id. ¶¶ 43, 45. "As such, SEPTA and its Defendant employees failed to make its trap door system safe for passengers and established a custom, usage, practice and policy under which SEPTA expressly chose to ignore a known and highly correctable safety problem in conscious disregard for public safety." Id. ¶ 46.

On July 25, 2012, Crockett filed an eight-count Complaint against Defendants. (ECF No. 1). Counts II and III of the Complaint sought relief from SEPTA under state law on the grounds of negligence and negligence per se. Counts I, IV, V, VI, VII, and VIII sought relief from all Defendants under 42 U.S.C. § 1983 for alleged violations of rights guaranteed by the Fourteenth Amendment.[2] On October 1, 2012, Defendants moved to dismiss Crockett's 1983 claims pursuant to Rule 12(b)(6). (ECF No. 19). The Court heard oral argument on Defendants' motion on December 19, 2012. During argument, the Court questioned whether the "paying customers of SEPTA's Regional Rail" could plausibly be a *discrete* class of foreseeable victims under the state-created danger doctrine. See Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 912-14 (3d Cir. 1997) (discussing requirement that plaintiff be either a known victim or part of a

---
[2] Crockett's Amended Complaint alleges the same eight claims.

4

discrete class of foreseeable victims). Without ruling on the matter, the Court gave Plaintiff the option of filing an amended complaint, which Plaintiff elected to do, (ECF No. 27), and which Defendants have again moved to dismiss (ECF No. 28). Rather than characterizing the discrete class of foreseeable victims as SEPTA's regional rail passengers, Crockett now characterizes the class as only those passengers "on Train Number 282 on September 1, 2010." Pl's Reply Br. at 23.

## III. LEGAL STANDARD[3]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[4] While all factual allegations must be accepted as true, Erickson v. Pardus, 551 U.S. 89, 94 (2007), this requirement does not apply to legal conclusions, Iqbal, 556 U.S. at 678. A court must thus distinguish factual allegations from legal conclusions and assess if the factual allegations make out a "plausible claim for relief" for every legal claim asserted. Id. at 679.

In this matter, the Court must determine if Crockett's federal claims under 42 U.S.C. § 1983 are plausible. "Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120 (1992) (quoting 42 U.S.C. § 1983)); see also Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996) ("Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the

---

[3] The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 1983. The Court has jurisdiction over Plaintiff's state tort claims pursuant to 28 U.S.C. § 1332.
[4] Iqbal clarified that the Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), which required a heightened degree of fact pleading in an antitrust case, "expounded the pleading standard for 'all civil actions.'" 555 U.S. at 684.

Constitution or federal laws."). Crockett's theory of relief under Section 1983 is that Defendants violated his substantive rights under the Fourteenth Amendment's Due Process Clause.

The Due Process Clause does not impose "affirmative obligation[s]" on state actors to "guarantee . . . certain minimal levels of safety and security." Collins, 503 U.S. at 126 (quoting DeShaney v. Winnebago Cnty. Dept. of Soc. Servs., 489 U.S.189, 195 (1989)). There are, however, two exceptions to this rule. The state has an affirmative duty to protect a person from harm when (1) it has physical custody (i.e., a "special relationship"), and (2) when it affirmatively acts to create a danger. Ye v. United States, 484 F.3d 634, 637 (3d Cir. 2007). The latter exception, known as the "state-created danger" exception, is the theory upon which Crockett's 1983 claims are based.

## IV. ANALYSIS

### A. Collins and Third Circuit Precedent Foreclose Crockett's Claims

At their base, Crockett's state-created danger claims are "fairly typical" tort claims that the Due Process Clause was not designed to supplant. Collins, 503 U.S. at 128. In Collins, the Supreme Court made clear that "the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." Id. Under this framework, the Court held that the Due Process Clause does not provide a remedy for injuries, even fatal ones, that result from a municipal employer's failure to protect its employees from a known risk. Id. at 117, 128. Since a claim arising from such an injury is "analogous to a fairly typical state-law tort claim," the Court reasoned that it does not come within the orbit of the Due Process Clause. Id. at 128.

In Searles v. Southeastern Pennsylvania Transportation Authority, 990 F.2d 789, 793 (3d Cir. 1993), the Third Circuit addressed a situation with "numerous significant similarities" to

Collins. The facts in Searles also bear a close resemblance to Crockett's claim here. Searles involved a claim against SEPTA for an injury that allegedly resulted from SEPTA's adoption of a maintenance program that it knew was recklessly unsafe. 990 F.2d at 790. As a result of this reckless maintenance program, plaintiff's husband was killed when an undiscovered defect caused one of SEPTA's railcars to derail. According to the court, "to find that the federal constitution imposes a duty on SEPTA to provide its riders with minimal levels of safety and security would be contrary to the holding in Collins." Id. at 792.

Although Crockett advances several arguments to distinguish Searles, each are unavailing. Crockett argues, first, that Searles is irrelevant because it preceded the Third Circuit's official adoption of the state-created danger theory in Kneipp, 95 F.3d at 1201. This argument has little, if any, merit. Not only was the state-created danger doctrine well-developed prior to Searles,[5] but the Searles court specifically rejected the doctrine's applicability to the facts before it. Noting that the "state-created danger theory is predicated upon the states' affirmative acts," the court stated that neither SEPTA's actions, nor the actions of the municipality in Collins, were "affirmative act[s] in the traditional sense." Id. at 793 (quoting D.R., 972 F.2d at 1374). The Third Circuit has since reiterated this point, noting that "the facts of [Searles] did not fall within [the state-created danger theory's] purview." Mark v. Borough of Haboro, 51 F.3d 1137, 1152 (3d Cir. 1995).

Arguing in the alternative, Crockett contends that Searles is distinguishable on its facts because "Plaintiff's Amended Complaint carries far more weight than the allegations in Searles." Pl's Reply Br. at 27-28. Specifically, Crockett argues that, unlike the Searles plaintiff, he has alleged: (1) "others had been injured in exactly the same manner as [the] Plaintiff"; (2) "rather

---

[5] See D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1373-76 (3d Cir. 1992) (discussing the origin and judicial application of the state-created danger doctrine).

7

than mitigating the known risk, SEPTA managers affirmatively acted to make the risk more significant by deciding to forgo daily trap door inspections in order to save money"; (3) Defendants' decision to forego daily inspections was based on their "reliance on the sovereign immunity cap" to damages, rather than the "best interests of passengers"; and (4) "SEPTA knew the trap doors on Train Number 282 were defective on the day of his accident." Id. These distinctions,[6] however, do not give rise to a due process claim, as becomes evident when examining Crockett's factual allegations under the four-pronged standard that the Third Circuit has established for state-created danger claims.

**B.     Crockett's Detailed Allegations Do Not Satisfy Mandatory Elements of State-Created Danger Claim**

Viable state-created danger claims have been limited in this jurisdiction and others to situations where the state actor's affirmative conduct creates an "immediate threat of harm," Avalos v. City of Glenwood, 382 F.3d 792, 800 (8th Cir. 2004), to a known person or a relatively small group of individuals, Morse, 132 F.3d at 912-14, with "no countervailing public benefit," Lombardi v. Whitman, 485 F.3d 73, 83 (2d Cir. 2007). In the Third Circuit, a viable state-created danger claim has four mandatory elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

---

[6] Crockett's factual allegations are more specific than those in Searles. The significance of this greater factual specificity is uncertain, however, because the Searles plaintiff was not subject, as Crockett is, to Iqbal's heightened pleading standard. See supra note 4.

8

Sanford v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006) (quoting Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006)). The Court will focus its inquiry here on the last three elements, as these are the elements that most clearly differentiate state-created danger claims from ordinary tort claims, and against which Crockett's allegations fall short.

**1. Defendants' Alleged Conduct Does Not "Shock the Conscience" Under Existing Precedent**

The Third Circuit has made clear that "in *any* state-created danger case, the state actor's behavior must *always* shock the conscience." Sanford, 456 F.3d at 310 (emphasis in original). When time exists to make "unhurried judgments," Cnty. of Sacramento v. Lewis, 523 U.S. 833, 853 (1998), a state actor shocks the conscience by acting with "deliberate indifference" to "'a substantial risk of serious harm.'" Kaucher v. Cnty. of Bucks, 455 F.3d 418, 436 (3d Cir. 2006) (quoting Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002)). Here, Crockett argues that Defendants acted with deliberate indifference by implementing a policy that placed saving money over protecting passenger safety. Specifically, Crockett alleges that Defendants knowingly exacerbated the risks from the trap doors by ending daily inspections, content with the knowledge that a statutory damages cap limited SEPTA's liability for personal injuries to $250,000 per claim. These allegations, while they may shock the conscience of some, fail to set forth conscience-shocking conduct as defined by the Supreme Court, Third Circuit, and other federal appellate courts.

Even if it increased a known risk, Defendants' decision "to save money" by foregoing daily inspections is the type of budgetary decision that state governments are presumptively entitled, if not forced, to make. In Collins, the Supreme Court stated that policy decisions about how to allocate limited government resources "involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic

charter of Government for the entire country." 504 U.S. at 129. The Collins Court set forth a "presumption," therefore, "that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." Id. at 128. In light of this presumption, federal courts have been "careful not to second guess" state decisions about how to allocate limited resources, Uhlrig v. Harder, 64 F.3d 567, 576 (10th Cir. 1995), even where the decisions create a "known risk," Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 540 (6th Cir. 2008), and "even if some decisions could be made to seem gravely erroneous in retrospect," Lombardi, 485 F.3d at 84. Accordingly, Defendants' decision to save limited governmental resources is presumptively constitutional under the Due Process Clause,[7] even if an inevitable trade-off of this decision was the creation or enhancement of a known risk.

Whatever the egregious circumstances are that would rebut the Collins presumption,[8] they are not satisfied by Crockett's allegations. Crockett's assertion, for instance, that 282's trap doors were "extremely dangerous," Am. Compl. ¶ 37, is limited by his other allegations. Despite extensive pre-litigation discovery,[9] Crockett does not allege that a single passenger was injured by 282's trap doors during the twenty years preceding his injury. The only injury that Crockett alleges is a single incident in which an employee "tripp[ed] over a door that had sprung open." Id. ¶ 48.

---

[7] The fact that SEPTA "is not strictly a governmental entity," Pl's Br. at 18 n.1, does not change this conclusion. Although Crockett points out that SEPTA only receives a third of its funding from the Commonwealth and has the "power to increase fares if it needs more revenue," id., the question of whether to increase the cost of public transit to ensure greater passenger safety involves the same "host of policy choices" for which the Due Process Clause is presumptively silent. See Collins, 504 U.S. at 128-29.

[8] See Robischung-Walsh v. Nassau Cnty. Police Dep't, 421 F. App'x. 38, 41 (2d Cir. 2011) ("While the alleged deliberate indifference of state actors may in some circumstances rise to a conscience-shocking level, this *ordinarily* is not so when the defendants are 'subject to the pull of competing obligations.'" (emphasis added) (quoting Lombardi, 485 F.3d at 83)).

[9] After Crockett was injured, he obtained "hundreds of pages of SEPTA's own documents and records" by filing several Right-to-Know requests under Pennsylvania's Right-to-Know Law. Pl's Br. at 2-3.

While Crockett alleges that trap doors injured passengers on other SEPTA rail cars, it is questionable whether the number and gravity of these injuries is "substantial" when considered in the context of SEPTA's large passenger load. In 2007, Crockett alleges that there were "at least nine instances of trap door related injuries reported." Id. ¶ 31. Since Crockett alleges that the injuries "mounted through the years," id., the Court must infer that there were less than nine reported injuries per year prior to SEPTA making its decision, in 1996, to end daily inspections. Since millions of passengers ride SEPTA's regional rail system each year,[10] it is questionable whether the alleged injury rate rises to the level of a "substantial risk," particularly when none of the injuries are alleged to have been fatal.

Finally, Crockett's allegation that Defendants repeatedly repaired 282's trap doors does little to support the plausibility that Defendants acted with deliberate indifference. Crockett alleges that Defendants repaired 282's trap doors "more than 50 times since 1988." Id. ¶ 48. Since no passenger is alleged to have been injured by 282's trap doors during this lengthy period of time, it cannot be reasonably inferred that Defendants consciously disregarded a substantial risk by opting to inspect and repair 282's defects on a non-daily basis. Accordingly, the Court finds that Crockett has failed to allege conduct that rises to the level of conscience shocking as defined by existing legal precedent.

**2.     Plaintiff Was Not a Foreseeable Victim or Member of Discrete Class**

Even if Defendants' conduct was conscience shocking, Crockett's claims would still fail because, under the precedents that bind this court, he was neither a known victim nor a member of a discrete class of foreseeable plaintiffs. Since Crockett concedes that he was not a known

---

[10] According to public records, SEPTA's regional rail system provides over 30 million passenger rides a year, including over 3 million passenger rides per year on SEPTA's Trenton Line. SEPTA SERVICE PLANNING DEP'T, FISCAL YEAR 2013 ANNUAL SERVICE PLAN 55 (2013), http://www.septa.org/reports/pdf/asp13.pdf (last visited June 12, 2013); SEPTA OPERATING FACTS: FISCAL YEAR 2012, at 3 (2012), http://www.septa.org/reports/pdf/opfacts.pdf (last visited June 12, 2013).

victim, as he must, the Court will focus its analysis on whether he was a member of a discrete class.

In Morse, the Third Circuit provided an in-depth discussion of the discrete class requirement. See 132 F.3d at 912-14. The court noted that, "[w]here the state actor has allegedly created a danger towards the public generally, rather than an individual or group of individuals, holding a state actor liable for the injuries of *foreseeable plaintiffs* would expand the scope of the state-created danger theory beyond its useful and intended limits." Id. at 913 n.12 (emphasis added). Foreseeability alone, therefore, is not sufficient to establish a discrete class; the plaintiff must be part of "a *limited group* of potential plaintiffs." Id. (emphasis added). The Third Circuit has only found this requirement satisfied where the state actor had "*individualized relationships* involving personal contact in *close temporal proximity* to the injury suffered." Martorano v. City of Philadelphia, No. 09-3998, 2009 WL 3353089, at *3 (E.D. Pa. Oct. 14, 2009) (emphasis added) (summarizing Third Circuit case law). This is consistent with the rule, expressed by the Seventh Circuit,[11] that a discrete class must be "limited in both time and scope." Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 828 (7th Cir. 2009).[12] Under this framework, a plaintiff is not part of a discrete class if the risk applies to thousands, or even hundreds, of people and the risk exists for an "indefinite" duration of time. Id. at 828-29; Jones v. Reynolds, 438 F.3d 685, 698 (6th Cir. 2006) ("[W]e are not aware of any case from our

---

[11] The Third Circuit's discrete class standard was based in large part on the Seventh Circuit's decision in Reed v. Gardner, 986 F.2d 1122, 1127 (7th Cir. 1993). See Morse, 132 F.3d at 913. As such, the Court finds the Seventh Circuit's subsequent interpretation of Reed to be particularly helpful in understanding the contours of the discrete class requirement. See Buchanan-Moore, 570 F.3d at 828-29 (explaining how the class of foreseeable victims in Reed was greatly limited by the very short duration of the risk, i.e., "a matter of hours").

[12] Accord Waddell v. Hendry Cnty. Sheriff's Office, 329 F.3d 1300, 1307 (11th Cir. 2003) ("Affirmative conduct for purposes of § 1983 should typically involve conduct that imposes an *immediate threat of harm*, which by its nature has a *limited range and duration*." (emphases added) (quoting Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002))).

circuit, or any other, in which a 'special danger' was found with respect to a group of 150 people allegedly placed 'specially' at risk by state action.").

Consistent with this precedent, courts in this District have previously taken the position that "SEPTA passengers do not constitute a 'discrete class' of potential plaintiffs under the state-created danger doctrine, by virtue of being in a 'customer and servicer' relationship with SEPTA." Burnette v. City of Philadelphia, No. 13-0288, 2013 WL 1389753, at *6 (E.D. Pa. Apr. 5, 2013) (Baylson, J.) (quoting Martinez v. Se. Pa. Transp. Auth., No. 08-5021, 2009 WL 5101824, at *5 (E.D. Pa. Dec. 15, 2009)). The Court recognizes that these prior SEPTA cases involved very different factual circumstances than the case at bar. The rule, however, that SEPTA passengers are too vast in size to constitute a discrete class, particularly to non-immediate threats, is a sound one. SEPTA passengers, as with car passengers on a highway, are an "unquantifiable and virtually unidentifiable mass of potential plaintiffs" that are indistinguishable from the general population at large. Solum v. Yerusalim, No. 98-4056, 1999 WL 395720, at *5 (E.D. Pa. June 17, 2009); accord Stover v. Camp, 181 F. App'x 305, 308 (3d Cir. 2006).

Against this backdrop, Crockett must articulate a reasonable basis for distinguishing himself from the millions of SEPTA passengers that faced the same elevated risk from Defendants' decision, in 1996, to end daily inspections. Crockett attempts to do this by characterizing the discrete class as only those "passengers riding on Train Number 282" on the day of his injury (September 1, 2010). This class, he argues, is "much smaller" than the groups of potential victims in previous cases where courts have found school students to be a discrete class of foreseeable victims from school employee malfeasance.[13] Pl's Br. at 21-22 (citing D.N.

---

[13] While several district courts in this Circuit have found school students to be a discrete class, the Third Circuit has not yet ruled on the issue. See Morse, 132 F.3d at 914 (declining to decide whether school students were

13

ex rel. Nelson v. Snyder, 608 F. Supp. 2d 615, 626 (M.D. Pa. 2009); Gremo v. Karlin, 363 F. Supp. 2d 771, 789 (E.D. Pa. 2005)).

Crockett's theory fails, however, because it does not identify a reasonable basis for treating as distinct the SEPTA passengers that happened to ride 282 on September 1, 2010. To be a distinct class, a group of potential victims must have been foreseeably distinct when Defendants committed the alleged culpable conduct, not merely when the injury occurred. See Jones, 438 F.3d at 697 ("When . . . the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the 'state created danger' theory.").

Here, Crockett's narrow characterization of the class is undermined by his own allegations. Crockett alleges that the trap door defect was a widespread and longstanding problem with SEPTA's rail cars that caused many passenger injuries. See Am. Compl. ¶¶ 28-36, 43-46. None of these injuries, however, are alleged to have occurred on 282. Nor is there anything in Crockett's allegations that would indicate a heightened risk on the day of September 1, 2010. While Crockett alleges that 282's trap doors had not been inspected for approximately 90 days prior to his injury, id. ¶ 68, this was not a unique or novel occurrence. As Crockett alleges, it has been Defendants' policy, since 1996, to limit inspections to once every 92 days. Countless other rail cars on countless other days would have thus faced the same scenario that 282 faced on the day of Crockett's injury. Accordingly, Crockett has failed to identify a basis by which Defendants could have reasonably foreseen (1) a greater risk to 282 passengers than passengers on other rail cars, or (2) a greater risk on September 1, 2010 than any previous day since 1996.

---

"sufficiently discrete group of persons who could have been foreseeable victims of an armed and dangerous intruder," noting that it was "by no means an easy question").

14

Leaving aside Crockett's somewhat arbitrary distinctions, the Court concludes that the class of foreseeable victims is more appropriately characterized under Third Circuit precedent as the millions of passengers that rode SEPTA's regional rail system following SEPTA's decision to forego daily inspections. This conclusion comports with the rule that the class of victims must be foreseeable to the state actor at the time of the allegedly culpable act, which, in this case, was Defendants' decision to end the daily inspections in 1996.[14]  See Jones, 438 F.3d at 697.

**3.     Defendants Did Not Commit an Affirmative Act**

Yet another fatal problem with Crockett's Amended Complaint is the failure to plausibly plead an affirmative act. An affirmative act is an essential element of a state-created danger claim; it is not sufficient to plead an omission, or failure to act. Sanford, 456 F.3d at 311-12. Accordingly, decisions to forego remedying known hazards are not affirmative acts for purposes of state-created danger claims,[15] and courts have repeatedly rejected attempts to characterize them as such. E.g., Kaucher, 455 F.3d at 436 ("Despite their attempts to characterize defendants' actions as affirmatively creating dangerous conditions, they allege a failure to act to prevent dangerous conditions.").

A recent en banc decision by the Third Circuit provides useful guidance for distinguishing affirmative acts (action) from omissions (inaction). See Morrow v. Balaski, --- F.3d ---, 2013 WL 2466892, at *14-15 (3d. Cir. 2013) (en banc). In Morrow, the court addressed

---

[14] Even if the culpable act is narrowly defined as Defendants' failure to inspect the trap doors on September 1, 2010, this would not change the result. For, even under this narrower theory, the class of potential victims would include every passenger on every rail car that did not receive an inspection. Since anyone from the general population, including tourists from around the world, could have been a passenger on these rail cars, the scope of the class would have been as "unquantifiable and virtually unidentifiable" as the class of drivers in Solum, 1999 WL 395720, at *5, and Stover, 181 F. App'x at 308.

[15] See, e.g., Kaucher, 455 F.3d at 424 (finding no affirmative act where prison allowed unsanitary prison conditions to worsen); Goss v. Alloway Twp. Sch., 790 F. Supp. 2d 221, 227 (D.N.J. 2011) (finding no affirmative act where school's cost-cutting policy resulted in failure to maintain safe premises); Thornton v. Abington Sch. Dist., No. 09-4320, 2009 WL 5126348, at *5 (E.D. Pa. Dec. 29, 2009) (finding no affirmative act where school failed to fix known hazard); Solum, 1999 WL 395720, at *6 (finding no affirmative act in decision to direct state funds away from fixing unsafe road).

15

a scenario in which school authorities allowed a criminally adjudicated delinquent to return to school after serving a suspension for assaulting and harassing two of the school's students. Id. at *1-2. Upon returning to school, authorities allowed the delinquent student to board a bus upon which one of the two students she previously assaulted and harassed was riding. Id. at *2. In affirming the dismissal of the plaintiffs' claim, the court's majority expressly rejected the dissent's position that the school's decisions were an affirmative "exercise of authority." Id. at *15. According to the dissent, "state authority necessarily brings with it discretion as to whether or not to take specific actions, and the decision to take one action over another—or to take no action at all—is itself an 'affirmative exercise of authority' that may carry serious consequences." Id. at *33 (Fuentes, J., dissenting). The Morrow majority rejected this formulation because "[a]ny and all failures to act would be transformed into an affirmative exercise of authority." Id. at *15. Such a formulation is untenable, the court explained, because it would vitiate the holding in Delaney that states have no constitutional duty to "guarantee . . . minimal levels of safety and security." 489 U.S. at 195.

Here, Crockett contends that Defendants acted affirmatively by adopting a policy to forego daily inspections of the trap doors. At bottom, however, the decision to forego daily inspections is a decision to forego exercising state authority. Under Morrow, this constitutes inaction, rather than action. Crockett himself describes SEPTA's actions as "*failing to correct the regional rail trap door system*," "*fail[ing] to make its trap door system safe* for passengers," and "establish[ing] a custom, usage, practice and policy under which SEPTA *expressly chose to ignore* a known and highly correctable safety problem in conscious disregard for public safety." Am. Compl. ¶¶ 45-46 (emphases added).

16

It is immaterial that Crockett characterizes the failure to conduct daily inspections as a "custom, usage, practice, and policy" that Defendants "adopted" and "established." As in Morrow, "merely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." 2013 WL 2466892, at *15. More importantly, the Third Circuit in Searles expressly rejected the idea that "adopt[ing] and approv[ing]" an unsafe maintenance program constitutes an "affirmative act in the traditional sense." 990 F.2d at 793. It was on this basis that the Searles court rejected the viability of a state-created danger claim in a context very similar to the one at bar. Although Crockett cites several cases to buttress his argument, none are as relevant or binding as Morrow and Searles.[16] Accordingly, the Court finds that Crockett has failed to plausibly set forth an affirmative act.

## C.    Individual Defendants Are Entitled to Qualified Immunity

Qualified immunity provides an alternative grounds for dismissing Crocketts' state-created danger claims against the individual Defendants. Under the doctrine of qualified immunity, government officials are shielded from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Miller v. Clinton Cnty., 544 F.3d 542, 547 (3d Cir. 2008) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity "is not merely a defense," but "'an entitlement not to stand trial or face the other burdens of litigation.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 200 (2001)). As such, "any claim of qualified immunity must be resolved at the earliest possible stage of litigation." Id. (quoting Saucier, 533 U.S. at 201).

---

[16] Crockett cites the following three cases: Rivas v. City of Passaic, 365 F.3d 181 (3d Cir. 2004); C.J.S. v. Bd. of Dirs. of City Trusts, No. 11-1471, 2011 WL 3629171 (E.D. Pa. Aug. 17, 2011): Gremo v. Karlin, 363 F. Supp. 2d 771 (E.D. Pa. 2005). The Court finds Gremo to be of no assistance to Crockett, as the defendants' conduct included unequivocally affirmative acts (e.g., threatening retribution against teachers who spoke out about dangerous school conditions and concealing violent incidents from outside authorities). While the defendants' conduct in Rivas and C.J.S. was more passive, the probative value of these two cases is questionable in light of their distinctly different factual contexts and the Third Circuit's recent guidance in Morrow.

Here, the individual Defendants could not have reasonably foreseen that their alleged conduct violated Crockett's constitutional rights. As discussed above, there is no legal precedent for allowing a state-created danger claim where the state action is a resource allocational decision that slightly increases the risk of non-life threatening harm to millions of people in the general population. Accordingly, even if the Court found Crockett's claim to be viable, the claims against the individual Defendants would still need to be dismissed on qualified immunity grounds.

**D.     Additional Considerations**

The fact that the alleged circumstances in this case do not rise to the level of a constitutional violation does not mean that Crockett is without a remedy. Crockett's Amended Complaint includes two state negligence claims against SEPTA and Defendants' motion does not challenge the viability of these claims as pled. To the extent that Crockett prevails on these claims, and to the extent Pennsylvania's statutory damages cap prevents him from fully recovering for the injuries he suffered, he may or may not have a claim about the state or federal constitutionality of the cap. That issue, however, is not before this Court. The only issue that the Court has addressed today is the constitutionality of Defendants' conduct under the Due Process Clause of the Fourteenth Amendment.

**V.     CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss Counts I, IV, V, VI, VII, and VIII of Plaintiff's Amended Complaint will be **GRANTED**.

An appropriate order follows.

O:\CIVIL 12\12-4230 crockett v. septa\mtd_opinion.docx